20-0132

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Chapter 7 |
| | ) | |
| **Lyndon D. Taylor,** | ) | No. **20-07420** |
| | ) | |
| Debtor. | ) | Judge: Hon. Janet S. Baer |
| | ) | |
| ----------------------------------------------------- | ) | |
| **Kapitus Servicing, Inc., as sub-servicing** | ) | |
| **Agent for Kapitus LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. **20-00221** |
| | ) | |
| **Lyndon D. Taylor**, | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF MOTION

TO:   Dustin B. Allen (DAllen@VABLawFirm.com)

PLEASE TAKE NOTICE that on February 19, 2021, at 11:00 a.m., I will appear before the Honorable Janet S. Baer, or any judge sitting in that judge's place, and present Defendant Lyndon D. Taylor's **Motion to Dismiss Amended Complaint to Determine Non-Dischargeability of Debt**, a copy of which is attached.

This motion will be presented and heard electronically using Zoom for Government. No personal appearance in court is necessary or permitted. To appear and be heard on the motion, you must do the following: To appear by video, use this link: https://www.zoomgov.com/. Then enter the meeting ID and password. To appear by telephone, call Zoom for Government at 1-669-254-5252 or 1-646-828- 7666. Then enter the meeting ID and password. Meeting ID and password. The meeting ID for this hearing is 160 731 2971 and the password is 587656. The meeting ID and password can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without a hearing.

LYNDON D. TAYLOR

By:   /s/David E. Cohen
His Attorney

David E. Cohen
Fisher Cohen Waldman Shapiro, LLP
1247 Waukegan Road
Suite 100
Glenview, Illinois 60025
312/606-3451 – Tel
dcohen@fishercohen.com – E-mail
Attorney No. 6192149

## CERTIFICATE OF SERVICE

DAVID E. COHEN, duly sworn on oath, deposes and states that he caused a copy of the foregoing Notice and Motion to be served on the above person(s) via either 1) the Court's Electronic Notice System or 2) if indicated, by U.S. First Class Mail, postage prepaid or 3) if indicated by Certified Mail this 29th day of January, 2021.

/s/David E. Cohen

20-0132

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Chapter 7 |
| | ) | |
| **Lyndon D. Taylor,** | ) | No. **20-07420** |
| | ) | |
| Debtor. | ) | Judge: Hon. Janet S. Baer |
| | ) | |
| ---------------------------------------------------- | ) | |
| **Kapitus Servicing, Inc., as sub-servicing** | ) | |
| **Agent for Kapitus LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. **20-00221** |
| | ) | |
| **Lyndon D. Taylor**, | ) | |
| | ) | |
| Defendant. | ) | |

### MOTION TO DISMISS AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

NOW COMES Lyndon D. Taylor ("Dr. Taylor"), by and through his attorney David E. Cohen moving this Court, pursuant to Bankruptcy Rule 7012(b) and Bankruptcy Rule 7009, to dismiss the above adversary proceeding for failure to state a cause of action upon which relief can be granted and in support thereof states as follows:

1.      On December 30, 2020, Plaintiff filed its' two-count amended adversary complaint (the "Adversary Complaint"). Attached as Exhibit "1" is a copy of the Adversary Complaint[1].

2.      Count I is based on section 523(a)(2)(B). Count II is based on section 523(a)(4). Plaintiff has failed to state a cause of action for both counts under the facts plead by Plaintiff.

---

[1] Defendant has redacted his social security number and date of birth from Plaintiff's amended complaint.

Standard

3.      A complaint will be dismissed under Bankruptcy Rule 7012(b) [incorporating Rule 12(b)(6) of the Federal Rules of Civil Procedure] unless the complaint contains enough factual detail to give the defendant fair notice of the claim under Rule 8(a) with some facts supporting each element of the claim. *In re Albert Speisman*, 495 B.R. 398, 401 (Bkrtcy. N.D.Ill. 2013). In addition, the complaint must state a plausible claim with the Plaintiff allegations rising above a mere speculative level. *Id.*

4.      "Under Rule 9(b) [incorporated by Bankruptcy Rule 7009], a party 'must state with particularity the circumstances constituting fraud.' Fed.R.Civ.P. 9(b). 'Particularity means the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Id.*

Count I - §523(a)(2)(B)

5.      Count II should be dismissed for failure to state a cause of action.

6.      Only written, not verbal statements, concerning a debtor's financial condition can form the basis of a Section 523(a)(2)(B) complaint.

7.      As such, any alleged statements by Dr. Taylor during the Pre-Funding Call is an oral statement and should be ignored by the Court.

8.      The entire application form submitted to Plaintiff as set forth in Plaintiff's Exhibit A to the Amended Complaint is as follows[2]:

---

[2] Plaintiff has once again included Defendant's social security number and date of birth in the amended complaint. Debtor has redacted the social security number and date of birth on Plaintiff's Exhibit A. As filed with the court the amended adversary complaint did not redact Defendant's social security number and date of birth.

9.      The application is to Bankers Healthcare Group, LLC, not to Kapitus, LLC. Nothing has been plead by Plaintiff showing any nexus between Bankers Healthcare Group, LLC and Kapitus, LLC.

10.     The date on the application is June 26, 2018. However, the Future Receivables Factoring Agreement attached as Exhibit B to the amended complaint is dated over a year later, on August 26, 2019.

11.     Even if this June 26, 2018 application is somehow related to the factoring agreement with Kapitus, LLC, Plaintiff has not identified any materially false statement concerning the financial condition of Lyndon D. Taylor, M.D., LLC in Exhibit A of the amended complaint because there are zero statements concerning the financial condition of

3

Lyndon D. Taylor, M.D., LLC in the document.

12.    As such, any reliance by Plaintiff was based solely on the oral representations during the pre-funding call. But that reliance is misplaced because false statements are only actionable if made in writing.

13.    The United States Supreme Court, in the case of *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1764, 201 L. Ed. 2d 102 (2018), explained why pre-funding calls such as that used by the Plaintiff should not be used on Section 523(a)(2)(B) complaints:

> Specifically, as detailed in *Field,* the House Report noted that consumer finance companies frequently collected information from loan applicants in ways designed to permit the companies to later use those statements as the basis for an exception to discharge. Commonly, a loan officer would instruct a loan applicant " 'to list only a few or only the most important of his debts' " on a form with too little space to supply a complete list of debts, even though the phrase, " 'I have no other debts,' " would be printed at the bottom of the form or the applicant would be " 'instructed to write the phrase in his own handwriting.' " *Id.,* at 77, n. 13, 116 S.Ct. 437. If the debtor later filed for bankruptcy, the creditor would contend that the debtor had made misrepresentations in his loan application and the creditor would threaten litigation over excepting the debt from discharge. That threat was "often enough to induce the debtor to settle for a reduced sum," even where the merits of the nondischargeability claim were weak. H.R. Rep. No. 95–595, p. 131 (1977).
>
> Notably, Lamar's interpretation of "statement respecting the debtor's financial condition" would not bring within § 523(a)(2)(B)'s reach the very types of statements the House Report described, because those debts-only statements said nothing about assets and thus did not communicate fully the debtor's overall financial status. Yet in *Field,* the Court explained that the heightened requirements for nondischargeability under § 523(a)(2)(B) were intended to address creditor abuse involving such statements. 516 U.S., at 76–77, 116 S.Ct. 437. Lamar's construction also would render § 523(a)(2)(B) subject to manipulation by creditors, frustrating the very end Congress sought to avoid when it set forth heightened requirements for rendering nondischargeable "statements respecting the debtor's financial condition."

14.    Without the pre-funding telephone call there is no basis to avoid discharge on this debt. Count I under 11 U.S.C. §523(a)(2)(B) must be dismissed for failure to state a cause of action.

4

Count II - §523(a)(4)

15.     Count II should also be dismissed as Plaintiff's allegations do not meet the heightened pleading requirements required under Federal Rule of Civil Procedure Rule 9(b), as incorporated by Rules of Bankruptcy Procedure Rule 9006.

16.     Under Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9 Fed.R.Civ.P.

17.     Plaintiff argues that the defendant is a fiduciary under the laws of the State of Virginia. However, federal law, not Virginia law, determines if a defendant is a fiduciary:

> Federal law preempts any effort by state and local governments to determine which assets may be reached, for what purposes, by particular creditors. See, e.g., *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). The meaning of the words in § 523(a)(4) is a question of federal law, see *In re Frain,* 230 F.3d 1014, 1017 (7th Cir.2000), which state and local governments cannot influence by attaching the word "trust" or any equivalent label to arrangements that lack the normal attributes of those devices.

*In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003).

18.     Plaintiff has failed to state with particularity that Dr. Taylor is a fiduciary under federal law.

19.     In addition, Plaintiff has failed to state with particularity the circumstances constituting the alleged fraud.

20.     Plaintiff has failed to meet this burden. Count II, based on section 523(a)(4), should be dismissed.

WHEREFORE, Lyndon D. Taylor respectively requests that this Court dismiss the amended complaint and pending adversary proceeding and for such other and further relief that this Court shall deem just.

LYNDON D. TAYLOR

By:   /s/David E. Cohen
His Attorney

David E. Cohen
Fisher Cohen Waldman Shapiro, LLP
1247 Waukegan Road
Suite 100
Glenview, Illinois 60025
312/606-3451 – Tel
dcohen@fishercohen.com – E-mail
Attorney No. 6192149

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | **Case No. 20-07420** |
| **LYNDON D. TAYLOR,** | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | **Honorable Janet S. Baer** |
| | ) | |
| | ) | |
| **KAPITUS SERVICING, INC., as subservicing** | ) | |
| **agent for KAPITUS, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Adv. No. 20-00221** |
| | ) | |
| | ) | |
| **LYNDON D. TAYLOR,** | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE

*To the following parties that have been noticed by CM/ECF electronic delivery:*
U.S. Trustee:  USTPRegion11.ES.ECF@usdoj.gov
David Cohen, Attorney for Defendant:  DCohen@fishercohen.com

*To the following parties that have been noticed by first-class U.S. Mail, postage prepaid:*
Lyndon Taylor, 2 Oak Brook Club Drive, Unit C-304, Oak Brook, IL 60523

**PLEASE TAKE NOTICE** of the attached Amended Complaint to Determine Non-Dischargeability of Debt.

                    **Valentine Austriaco & Bueschel, P.C.**


                    */s/ Dustin B. Allen*

                    ***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I, Dustin B. Allen, hereby certify that this Notice and all attachments were served in the manner described upon the parties named above, on or before December 30, 2020, before 5:00PM.


**Valentine Austriaco & Bueschel, P.C.**


*/s/ Dustin B. Allen*


Lydia A Bueschel (Bar no. 6274638)
Dustin B. Allen (Bar no. 6312451)
DAllen@VABLawFirm.com
Phone:  312-288-8285
Fax:  312-638-8137

***Attorneys for Plaintiff***

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | **Case No. 20-07420** |
| **LYNDON D. TAYLOR,** | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | **Honorable Janet S. Baer** |
| | ) | |
| | ) | |
| **KAPITUS SERVICING, INC., as subservicing** | ) | |
| **agent for KAPITUS, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Adv. No. 20-00221** |
| | ) | |
| | ) | |
| **LYNDON D. TAYLOR,** | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT**

Kapitus Servicing, Inc., as sub-servicing agent for Kapitus LLC ("Kapitus" or "Plaintiff")

seeks to determine the debt owed it by the Debtor as non-dischargeable.   In support, Kapitus states

as follows:

**Jurisdiction and Venue**

1.      Kapitus brings this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(B), 11

U.S.C. § 523(a)(4), and Rule 4007, Federal Rules of Bankruptcy Procedure.

2.      The Lyndon D. Taylor is a Debtor in Chapter 7 Case No. 20-16830 in this Court

(the "Bankruptcy Case"), and Kapitus is one of his creditors. [1]

---

[1] Notwithstanding any of the allegations and claims herein, the institution of this Adversary Proceeding,
the filing of this complaint and any other appearance in this Adversary Proceeding and in the Bankruptcy
Case, including the submission of motions, opposition papers, and entry of orders, is without waiver, and
express reservation, of any and all of Kapitus's rights, defense and remedies available at law and in

3.      This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(I).

4.      Venue in this court is proper pursuant to 28 U.S.C. § 1409.

## Parties

5.      Plaintiff, Kapitus Servicing, Inc. is a Virginia corporation with its principal places of business at 2500 Wilson Boulevard, Suite 350 Arlington, Virginia 22201 and 120 West 45th Street, New York, New York 10036.

6.      Lyndon D. Taylor ("Debtor") is an individual residing at 2 Oak Brook Club Drive, Unit C-304, Oak Brook, Illinois 60523.

7.      Upon information and belief, Lyndon D. Taylor, M.D., LLC ("Merchant") is an Illinois corporation with three locations and three assumed names:  Healthcare for Women – North Riverside; Healthcare for Women – Melrose Park; and Healthcare for Women – Oak Park.  The assumed name of Healthcare for Women – Melrose Park is listed with the Illinois Secretary of State as "Inactive," while the other two are listed as "Active."

8.      Merchant is an insider of the Debtor pursuant to 11 U.S.C. §101(31)(A).

9.      According to Debtor's Schedule A/B, Debtor is 100 percent owner of Merchant.

10.      Upon information and belief, Debtor is, and was, the Merchant's sole owner, controlled Merchant, and made all decisions and statements to Plaintiff relevant to the issues herein.

---

equity, including, without limitation, under the Agreement (as defined below), Uniform Commercial Code, any other applicable federal or state law and/or commercial code, and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*.  Kapitus expressly incorporates any reservation of rights that it intends to include, or has included, in any proof of claim filed, or to be filed, in the Bankruptcy Case.

**Background**

11.     As detailed below, Debtor fraudulently induced Plaintiff Kapitus into purchasing future accounts receivable from Merchant, and later improperly diverted the purchased receivables away from Kapitus and for his own benefit.

***Debtor's Misrepresentations to Kapitus to Induce the Purchase of Receivables***

12.     On or about June 26, 2018, Debtor, reaffirmed his previously completed application for funding ("Application") for Merchant.  A true and accurate copy of the Application upon which Kapitus relied is attached hereto as Exhibit A.

13.     In the Application, Debtor represented that Merchant had prior year gross sales of $191,364, and that he was seeking funding of $150,000 for "business development." (Ex. A.)

14.     The Application further included the representation, acknowledgment and agreement by Debtor and Merchant that it would immediately notify Kapitus of "any change in the information or documents provided . . . in connection herewith or Applicant's financial condition." (Ex. A).

15.     Thereafter, Debtor provided bank statements for a time period from May through July of 2019.

16.     Kapitus relied on these bank statements to determine Merchant's eligibility for funding.

17.     After receiving the Application, Kapitus provided Debtor a Revenue Based Factoring Agreement, Security Agreement, and Guaranty (together the "Agreement"), which outlined the purchase terms and included representations that Debtor and Merchant were required to make.  A true and accurate copy of the Agreement as executed by Debtor is attached as Exhibit B.

3

18.     Kapitus requires, as a threshold step in its consideration of whether to purchase a
potential merchant's future receivables, that each merchant sign the agreement and provide certain
written representations about its financial situation, operational plans, and intentions. Because
Kapitus's funding process is truncated from that of a standard financing institution as is typical for
the alternative financing industry, Kapitus relies heavily upon a merchant's representations and
warranties made in each agreement and confirmed in a recorded call. In fact, Kapitus's counter
signature to the agreement and funding are the last steps in the financing process.

19.     In the Agreement signed by Debtor on August 26, 2019, Debtor agreed to sell
$93,400.00 (the "Receipts Purchased Amount") of Merchant's future business receipts in exchange
for a payment from Kapitus of $66,000.00 (the "Purchase Price"). (Ex. B at 1).

20.     Under the Agreement, Kapitus was to purchase all of Merchant Lyndon D. Taylor,
M.D., LLC's "future receipts, accounts, contract rights and other obligations arising from or
relating to the payment of monies from [Merchant]'s customers and/or other third party payors…"
whether paid by "cash, check, electronic transfer, or other form of monetary payment in the
ordinary course of business" (collectively, the "Receipts") until the time that the Merchant paid
the Receipts Purchased Amount in full.  Ex. B at 1.

21.     Once Kapitus counter executed the Agreement and funded the Purchase Price, it
became the owner of Merchant's Receipts up to the Receipts Purchased Amount of $92,400.00.

22.     Under the terms of the Agreement, signed by Debtor on behalf of Merchant Lyndon
D. Taylor, M.D., LLC, and individually as its Guarantor, Debtor agreed to and represented that he
would collect and deposit all Receipts into a designated bank account (the "Account") and provide
irrevocable authorization to Kapitus to make ACH debits on a weekly basis from the Account,

representing a percentage of the Receipts, until the Receipts Purchase Amount was remitted. (Ex.
B at 3, Sec. 1.1).

23.     Debtor, on behalf of Merchant, and individually as its Guarantor, further agreed
that "Merchant understands that it is responsible for ensuring that funds adequate to cover the
amount to be debited by PURCHASER remain in the account." Ex. B at 1.

24.     Debtor further made representations in Section II (entitled REPRESENTATIONS,
WARRANTIES AND COVENANTS) of the Agreement, including, but not limited to:

> 2.1   **Financial Condition and Financial Information.**  Merchant is solvent,
> and no transfer of property is being made by Merchant and no obligation is
> being incurred by Merchant in connection with this Agreement with the
> intent to hinder, delay, or defraud either present or future creditors of
> Merchant. Merchant's bank statements and financial information, provided
> to PURCHASER fairly represent the financial condition of Merchant at
> such dates, and since those dates there has been no material changes,
> financial or otherwise, in such condition, operation or ownership of
> Merchant. Merchant is current on any and all lease, rent or mortgage
> payments due. **No material changes, financial or otherwise, in the
> condition, operation or ownership of Merchant are in any way expected
> or anticipated. Merchant has a continuing, affirmative obligation to
> advise PURCHASER of any material change in its financial condition,
> operation or ownership.** PURCHASER may request statements at any
> time during the performance of this Agreement and the Merchant shall
> provide them to PURCHASER within 5 business days. Merchant's failure
> to do so is a material breach of this Agreement.

Ex. B at 3 (emphasis added).

25.     The Agreement further emphasized:

> **ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER
> IN CONNECTION WITH ANY APPLICATION FOR FUNDING, IN
> ANY DOCUMENT SUBMITTED AND/OR THIS AGREEMENT WILL
> RESULT IN A SEPARATE CAUSE OF ACTION, INCLUDING BUT
> NOT LIMITED TO A CLAIM AGAINST THE OWNER/GUARANTOR
> FOR FRAUD OR FRAUDULENT INDUCEMENT.**

Ex. B at  2 (emphasis in original).

26.     The Debtor personally guaranteed Merchant's full performance under the Agreement, including performance of all representations, warranties, and covenants. (Ex. B. at 6-7).

27.     After Debtor signed the Application, provided business and financial information, and signed the Agreement, Kapitus and the Debtor engaged in a recorded telephone call on August 29, 2019, (the "Pre-Funding Call"), which occurred prior to the funding of the Purchase Price and the execution of the Agreement by Kapitus.  During the Pre-Funding Call, Debtor represented that: (a) Debtor did not anticipate closing or selling the Merchant in the next twelve months; (b) neither Debtor nor the Merchant planned on filing for bankruptcy in the foreseeable future; and (c) Debtor and the Merchant were not in arrears on any loans or with any financial institutions.  Debtor's oral statements made in the Pre-Funding Call bolstered the written business and financial information that Debtor had previously provided and painted a favorable financial picture intended to induce Kapitus into approving the funding.

28.     In addition, the Kapitus representative in the Pre-Funding Call further explained to Debtor that he was required to notify Kapitus of any changes relating to the Merchant and that verification of information in the Call was the last step of the process prior to funding.

29.     Contrary to Debtor's representations in the Application, Agreement, and Pre-Funding Call, Debtor knew – but did not disclose – that his practice would materially change because the only hospital where he was authorized to admit patients, Westlake Hospital, and where he performed services remitted to Merchant, had filed for Chapter 7 bankruptcy relief on August 6, 2019 in the Northern District of Illinois, Case No. 19-22881.

30.     In fact, Debtor, on behalf of the Merchant, ultimately filed a claim in the Pipeline-Westlake Hospital bankruptcy for $77,280 of "physician services provided," including for the maximum amount allowable of services provided within 180 days of the filing of bankruptcy. *See* Claim No. 94-1 of Lyndon D. Taylor, M.D, attached as Exhibit C.

6

31.     Despite knowing that a significant source of income for Merchant was ending, Debtor affirmed in the Agreement that "[n]o material changes, financial or otherwise, in the condition, operation or ownership of Merchant are in any way expected or anticipated."  Debtor also acknowledged in the Agreement that he had "a continuing, affirmative obligation to advise [Kapitus] of any material changes in its financial condition, operation or ownership." Nevertheless, both at the time he signed the Agreement and three days later when the Pre-Funding Call took place, Debtor failed to disclose the Westlake Hospital bankruptcy.

32.     In fact, before Debtor signed the Agreement and undertook the Pre-Funding Call, he had received an August 6, 2019 letter to all employees and physicians advising them that "Westlake has lost nearly $3 million per month and remained over 80 percent empty. As of this month, Westlake Hospital has run out of money. Despite a months-long effort by Westlake Hospital to find a buyer, none of the entities it spoke with believed it was financially feasible to keep the Hospital open."   Letter to Westlake Employees and Physicians attached as Exhibit D.

33.     Without knowledge of the Westlake Hospital bankruptcy and in reliance on the materials submitted and the representations made by Debtor in the Agreement, the Application, and the Pre-Funding Call, Kapitus agreed to purchase receivables of Merchant for the Purchase Price of $66,000.00, which, after Debtor authorized certain fees to be paid from this Purchase Price, resulted in a wire transfer on August 29, 2019 of $64,330 to Merchant.

### *Debtor Diverts, and Does Not Remit, the Receivables Owned by Kapitus*

34.     Merchant defaulted on its payment obligations under the Agreement in December 2019, when ACH debits started being returned for non-sufficient funds in Merchant's designated account, less than four months after having received the Kapitus funding.

35.     On March 16, 2020, Debtor filed for Chapter 7 bankruptcy protection.

36.     In total, Kapitus was only able to draft 17 ACH payments before the Debtor cut Kapitus off from debiting the purchased Receipts.  These 17 successful withdrawals represented less than 16 percent of the receivables purchased by Kapitus.

37.     Upon information and belief, the Debtor and Merchant stopped depositing its Receipts into the Account in violation of the Agreement (Ex. B at 1), leading to the pre-authorized Kapitus ACH debits to be returned for non-sufficient funds.

38.     Only after defaulting on the Agreement and allowing the Kapitus pre-authorized ACH debits to fail, did Debtor acknowledge to Kapitus on January 15, 2020, that Westlake Hospital had shut down and that the money that he had made from the hospital was supporting his practice – precisely the facts Debtor knew before obtaining the Kapitus funding but failed to disclose. *See* Ex. D.

39.     On information and belief, Debtor and Merchant continue to operate.  As a result, Merchant's Receipts that are, in fact, owned by Kapitus under the Agreement have been wrongfully diverted.  For example, when a representative of Kapitus attempted to contact Debtor on February 11, 2020, the Merchant's office told the Kapitus representative that Debtor was unable to take the telephone call because he was too busy seeing clients.  In addition, Merchant's website indicates that it is in operation and accepting client appointment.  *See* www.oakparkobgyn.com (last visited December 30, 2020).

40.     After the ACH payment on December 29, 2019, was returned for non-sufficient funds, all further payments were returned for non-sufficient funds and no further payments were received from Merchant or Debtor.

41.     In total, Kapitus is owed the principal amount of $77,445.00, plus a Default Fee of $2,500.00, returned ACH fees of $700.00, for a total balance of $80,645.00.

42.      In addition, under paragraph 3.3 of the Agreement, Debtor and Merchant are also liable for court costs and attorney's fees equal to 25 percent of any balance due, which amounts to $20,161.25.

## COUNT I

### (Non-Dischargeability of Debtor Pursuant to 11 U.S.C. § 523(a)(2)(B))

43.      Plaintiff repeats and realleges paragraphs 1 through 42 and incorporates the same as though set forth herein.

44.      Pursuant to 11 U.S.C. § 523(a)(2)(B), a debt in which a debtor obtains money by a statement in writing that is materially false respecting an insider's financial condition, on which the creditor reasonably relied, and which the debtor caused to be published with intent to deceive, is non-dischargeable.

45.      Prior to entering into the Agreement, the Debtor provided bank statements and other financial information to the Plaintiff as an indicator of the Merchant's financial condition.

46.      Debtor and the Merchant, an insider of the Debtor, obtained money from Plaintiff by making materially false statements in the Agreement respecting the Merchant's financial condition on which Plaintiff reasonably relied.

47.      As alleged above, Debtor, on behalf of Merchant, and individually as Guarantor, represented under the Agreement that "Merchant's bank statements and financial information, provided to PURCHASER fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material changes, financial or otherwise, in such condition, operation or ownership of Merchant."  In addition, Debtor represented that "[n]o material changes, financial or otherwise, in the condition, operation or ownership of Merchant are in any way expected or anticipated. Merchant has a

9

continuing, affirmative obligation to advise PURCHASER of any material change in its

financial condition, operation or ownership."

48.      The Plaintiff reasonably relied on Debtor's statements regarding Merchant,

including that Merchant's financial information provided to Plaintiff fairly represented the

true financial condition of the entity, that there had been no material change in financial

condition or operation of the Merchant, and that there was no expected change in the financial

condition or operation of the Merchant.

49.      As alleged above, Debtor knew that Westlake Hospital had filed for Chapter 7

bankruptcy and that the financial condition and operation of the Merchant would be

significantly and adversely impacted by the closure of Westlake Hospital.

50.      Debtor's conduct described above constitutes obtaining money by materially

false written statement regarding an insider's financial condition, on which Plaintiff relied,

and which the Debtor made with the intent to deceive.

51.      Debtor knew these representations were false, untrue, and misleading at the

time they made them.

52.      Debtor caused these false statements to be made in writing, including, but not

limited to, publishing the statements in the Agreement.

53.      Consequently, Debtor's debt to Plaintiff is one for money obtained by

materially false written statement regarding an insider's financial condition, on which

Plaintiff relied, and which the Debtor made with intent to deceive. Accordingly, Plaintiff is

entitled to an Order from this Court under 11 U.S.C. § 523(a)(2)(B), declaring Debtor's debt

to Plaintiff is non-dischargeable and awarding money damages pursuant to the request herein.

Plaintiff is also entitled to attorneys' fees and costs incurred in prosecuting this Complaint.

## COUNT II

**(Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4))**

54.     Plaintiff repeats and realleges paragraphs 1 through 53 and incorporates the same as though set forth herein.

55.     Debtor's liability to Plaintiff, as alleged herein, is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" within the meaning of section 523(a)(4) of the Bankruptcy Code.

56.     Debtor was in a fiduciary relationship with Kapitus under the Agreement, which is Agreement is governed by Virginia law. *See* Ex. B at 4, Section 4.5.

57.     Debtor and Merchant had a fiduciary duty to Kapitus when they began holding Kapitus's purchased receivables in trust for Kapitus. Under Virginia law, an express trust is created when money is to be kept or used as a separate fund for the benefit of the payor or a third person. Here, the parties entered into an express trust with regards to the purchased Receipts identified in the Agreement, and Merchant and Debtor began collecting Receipts. Merchant and Debtor were to hold the Receipts in the Account for Plaintiff's benefit.  (Ex. B. at 1 "Merchant understand that it is responsible for ensuring that funds adequate to cover the amount to be debited by PURCHASER remain in the account.").

58.     In breach of their fiduciary duties, Debtor and Merchant failed to deposit the Receipts purchased by Kapitus in the Account.  On information and belief, Debtor and Merchant have deposited Receipts into an account other than the Account identified in the Agreement, as a means of wrongfully diverting the Kapitus Receipts for their own use.

59.     Alternatively, Debtor and Merchant's misappropriation of the Receipts was embezzlement under section 523(a)(4) of the Bankruptcy Code.

60.     Plaintiff purchased all of the Merchant's Receipts generated until the Receipts

Purchased Amount was paid in full.

61.        Debtor embezzled Plaintiff's Receipts by fraudulently appropriating Plaintiff's property after they were entrusted to collect them.

62.        Upon information and belief, Debtor transferred the $ 64,330 Purchase Price funding and/or Receipts into accounts not accessible by Plaintiff and/or blocked sufficient payment of the Receipts from the Account.

63.        Plaintiff sustained damages as a result of Debtor's fraud and defalcation while acting as a fiduciary, their embezzlement and/or larceny of the funding and receivables.

64.        Debtor's debt to Plaintiff is a debt for fraud or defalcation while acting in a fiduciary capacity.   In the alternative, Debtor committed embezzlement and/or larceny. Plaintiff is entitled to an Order from this Court declaring that, pursuant to 11 U.S.C. § 523(a)(4), the Debtor's debt to Plaintiff is non-dischargeable and a judgment for money damages.  Plaintiff is also entitled to its attorneys' fees incurred in prosecuting this Complaint. WHEREFORE, Plaintiff requests that the Court enter judgment as follows:

A. Judgment declaring the entire debt in the amount of at least $ 77,445.00 owed by Debtor to Strategic is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) and 11 U.S.C. § 523(a)(4) in this Bankruptcy Case, in any other chapter under Title 11 to which this case may be converted, and in any future bankruptcy case filed by or against the Debtor;

B. For an award of damages comprised of the judgment amount due and interest at the Virginia statutory rate of 6 percent from the date of the judgment, February 20, 2019 to the petition date, September 9, 2020;

C. An award of all fees and costs incurred in collection proceedings and enforcement actions against Debtor and Merchant, including all fees and costs in bringing this action; and

D.  Such other relief as is just and proper under the circumstances.


Dated:  December 30, 2020                Respectfully submitted:

                                         **KAPITUS SERVICING, INC. as sub-servicing
                                         Agent for KAPITUS LLC**,

                                         One of Its Attorneys

                                         /s/ Dustin B. Allen_____

Lydia A. Bueschel (IL ARDC No. 6274638)
Dustin B. Allen (IL ARDC No. 6312451)
Valentine Austriaco & Bueschel, P.C
105 W. Adams Street 35th Floor
Chicago, IL  60603
312-238-9545
lbueschel@valawfirm.com
dallen@vablawfirm.com

# EXHIBIT A

DocuSign Envelope ID: B37894CA-8566-4A8D-85EB-C18CAA33D0CD
05/08/2018   12:42PM   17088484415          mAIN FAX                                    PAGE 03/28



CAPITAL APPLICATION FORM

| PRACTICE/BUSINESS INFORMATION | | | | | | Application #: 300423 | | |
|---|---|---|---|---|---|---|---|---|
| Full Legal Name of Practice/Business: | | Lyndon Taylor., MD., LLC d/b/a Healthcare For Women The Office Of Dr. Lyndon Taylor MD | | | | | | |
| Business Structure Type: | | Limited Liability Company (LLC) | | | | | | |
| Business Address: (No P.O. Box) | | 1100 Lake Street, Suite 260 Oak Park, IL 60301 | | | | | | |
| Business Phone: | 708-848-9440 | Business Fax: | | Date Established: | 06/16/2004 | | Fed ID #: | 72-1588775 |

| APPLICANT INFORMATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Full Name: | Lyndon D Taylor | | Specialty: | Physician/Surgeon (MD) | | License State: | IL | |
| Ownership %: | 100 | | D/O/B: | | SSN: | 9216 | | |
| Home Address: | 479 North Harlem Avenue , Oak Park, IL  60301 | | | | | | | |
| Home Phone: | | Cell Phone: | 708-828-3855 | | Email: | lyndontaylor@msn.con | | |
| Have you ever had any disciplinary actions on your healthcare license? | | | | | No | | | |
| Bankruptcy in last 10 Years? | No | | Intent to file bankruptcy in next 18 months? | | | No | | |

| ADDITIONAL GUARANTOR | | | | | | | |
|---|---|---|---|---|---|---|---|
| Full Name: | | | Specialty: | | | License State: | |
| Ownership %: | | | D/O/B: | | SSN: | | |
| Home Address: | | ,  , | | | | | |
| Home Phone: | | Cell Phone: | | | Email: | | |
| Bankruptcy in last 10 years? | No | | Intent to file bankruptcy in next 18 months? | | | No | |
| Have you ever had any disciplinary actions on your healthcare license? | | | | | No | | |

| USE OF FUNDS | | | |
|---|---|---|---|
| Primary use of funds: | Business Development | Amount needed: | $150,000.00 |

| ADDITIONAL BUSINESS INFORMATION | | | |
|---|---|---|---|
| Home based business?: | No | Prior year gross sales: | $191,364.00 |

The Owner(s)/Officer(s) and Merchant identified above (individually, an "Applicant") each represents, acknowledges and agrees that (1) Applicant will immediately notify Bankers Healthcare Group, LLC ("BHG") of any change in the information or documents provided to BHG in connection herewith or Applicant's financial condition, (2) each Assignee (as such term is defined in item (5) below) will rely upon the accuracy and completeness of such information and documents, (3) BHG, Assignees, and each of their representatives, successors, assigns and assignees (collectively, "Recipients") are authorized to request and receive any investigative reports, credit reports, statements from creditors or financial institutions, verification of information, or any other information that a Recipient deems necessary, (4) Applicant waives and releases any claims against Recipients and any information-providers arising from any act or omission relating to the requesting, receiving or release of information, (5) Applicant authorizes BHG to disclose all information and documents that BHG may obtain including credit reports to other persons, affiliates, partners or entities (collectively, "Assignees") that may purchase BHG referral lists and/or marketing databases or be involved with or acquire BHG commercial loans, commercial loans having daily repayment features, and/or Merchant Cash Advance transactions, including without limitation the application therefore (collectively, "Transactions") and each Assignee is authorized to use such information and documents, and share such information and documents with other Assignees, in connection with potential Transactions, (6) all information and documents provided to BHG including credit card processor statements are true, accurate and complete, and (7) each Owner/Officer represents that he or she is authorized to sign this form on behalf of Merchant.

Guarantor    Lyndon D Taylor    Managing Partner    Date    6/26/2018         X
                                                                              Guarantor                              Date

# EXHIBIT B

# Kapitus LLC

**Serviced through Kapitus Servicing, Inc.**
**2500 Wilson Boulevard Suite 350, Arlington, Virginia 22201**
**Ph. (844) 547-9396**
**Contract ID# 2579131**

## FUTURE RECEIVABLES FACTORING AGREEMENT (ACH)

Agreement dated <u>August 26 2019</u> between **Kapitus LLC ("PURCHASER")** and each of the merchant(s) listed below and on any attached addendum as applicable (the "<u>**Merchant**</u>") (the " Merchant Agreement" or the "Agreement").

### MERCHANT INFORMATION

| | | | |
|---|---|---|---|
| Merchant's Legal Name: <u>LYNDON D. TAYLOR, M.D. LLC</u> | | | |
| D/B/A: <u>Healthcare for Women: The Office Of Lyndon Taylor, MD</u> | | | |
| Type of entity: <u>Limited Liability Corporation</u> | | | |
| Physical Address: <u>1100 Lake St Ste 260</u> | City: <u>Oak Park</u> | State: <u>IL</u> | Zip: <u>60301-1095</u> |
| Mailing Address: | City: | State: | Zip: |
| Date business started (mm/yyyy): <u>06/2004</u> | Federal ID# <u>72-1588775</u> | | |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to PURCHASER in consideration of the funds provided ("<u>Purchase Price</u>") as specified below, all of Merchant's future receipts, accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors (collectively the "<u>Receipts</u>" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), until such time as the "<u>Receipts Purchased Amount</u>" or "<u>Purchased Amount</u>" has been delivered by Merchant to PURCHASER. The Receipts Purchased Amount shall be paid to PURCHASER by the Merchant irrevocably authorizing <u>only one</u> depositing account acceptable to PURCHASER (the "<u>Account</u>") to remit the percentage specified below (the "<u>Specified Percentage</u>") of the Merchant's Receipts, until such time as PURCHASER receives payment in full of the Receipts Purchased Amount. In consideration of servicing the account, the Merchant hereby authorizes PURCHASER to ACH Debit the "Specified Amount" from the merchant's bank account as the base payment credited against the Specified Percentage due. The Specified Amount is intended to represent the Specified Percentage of Receipts. For as long as no Event of Default has occurred, once each calendar month, Merchant may request that PURCHASER adjust the Specified Amount to more closely reflect the Merchant's actual Receipts. Merchant agrees to provide PURCHASER any information requested to assist in this reconciliation. Upon verification of such information, PURCHASER shall adjust the Specified Amount on a going-forward basis to more closely reflect the Merchant's actual Receipts. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Specified Amount until any subsequent adjustment. **It is the Merchant's responsibility to provide bank statements for any and all bank accounts held by the Merchant to reconcile the payments made against the Specified Percentage permitting PURCHASER to debit or credit the difference to the merchant so that payment equals the Specified Percentage.** Merchant understands that it is responsible for ensuring that funds adequate to cover the amount to be debited by PURCHASER remain in the account. Merchant will be held responsible for any fees incurred by PURCHASER resulting from a rejected ACH attempt or an event of default PURCHASER is not responsible for any overdrafts or rejected transactions in the Merchants account which may result from the scheduled ACH debits under the terms of this agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between PURCHASER and Merchant, upon the violation of any provision contained in Section 1.9 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all applicable fees is set forth in Appendix A.

**Purchase Price: $66,000.00**     **Specified Percentage: 11%**     **Specific Weekly Amount: $890.00**     **Receipts Purchased Amount: $92,400.00**

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE SECURITY AGREEMENT AND GUARANTEE ARE HEREBY INCORPORATED IN FULL AND MADE A PART OF THIS AGREEMENT.**

**MERCHANT**

By  ___Lyndon Taylor_____

       **(Print Name and Title)**

**Kapitus LLC**

By  ___Steve Podhorzer_____

       **(Company Officer)**

DocuSigned by:

*Lyndon Taylor*
E0B5D61A16FF412...
**(Signature)**

**(Signature)**

To the extent set forth herein, each of the parties is obligated upon his, her or its' execution of the Agreement to comply with all terms of this Agreement. Each of above-signed Merchant and Owner(s) represents and warrants that: (1) he or she is authorized to sign this Agreement for Merchant, legally binding the Merchant to deliver the receivables as agreed, and (2) the information provided herein, and in the applications provided, documents submitted, financial information provided, and in any interviews during underwriting is true, accurate and complete in all respects. If any information provided to PURCHASER is determined to be false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and PURCHASER and Owner(s) shall

be personally liable for the Merchant's obligations under the Personal Guaranty of Performance. Merchant, and each of the above-signed Owners authorizes PURCHASER, its agents and representatives and any credit reporting agency engaged by PURCHASER, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) obtain a credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation owed to PURCHASER.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH ANY APPLICATION FOR FUNDING, IN ANY DOCUMENT SUBMITTED AND/OR THIS AGREEMENT WILL RESULT IN A SEPARATE CAUSE OF ACTION, INCLUDING BUT NOT LIMITED TO A CLAIM AGAINST THE OWNER/GUARANTOR FOR FRAUD OR FRAUDULENT INDUCEMENT**



**AUTHORIZED SUB-SERVICING AGENT – Kapitus Servicing, Inc.**

**PURCHASER, as Agent, may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents. Kapitus Servicing, Inc. ("Kapitus Servicing") is the Authorized Sub-Servicing Agent of the PURCHASER for this contract providing administrative, bookkeeping, reporting and support services for the PURCHASER and the Merchant. Kapitus Servicing is acting as agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting, servicing, collections and remit capture. Merchant and Owner/Guarantor acknowledge and agree that PURCHASER has granted Kapitus Servicing all rights and authority as its general agent to take any and all actions to enforce the terms of this Agreement, through legal actions in the name of PURCHASER, or otherwise. Any and all authorizations and/or rights granted to PURCHASER under this Agreement are hereby granted to Kapitus Servicing, as servicer and general agent for PURCHASER. Kapitus Servicing is not a credit card processor, or in the business of processing credit cards. Merchant hereby acknowledges that in no event will Kapitus Servicing be liable for any claims made against the PURCHASER or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, actual, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/Guarantor.**

MERCHANT INITIALS: 

## I. GENERAL TERMS

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to PURCHASER, with a Bank acceptable to PURCHASER, to set up the Account and obtain electronic fund transfer services. Merchant shall provide PURCHASER and/or its authorized agent with all of the information, authorizations necessary for verifying Merchant's receivables, receipts and deposits into the Account. Merchant shall authorize PURCHASER to deduct the amounts owed to PURCHASER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant by permitting PURCHASER to withdraw the specific amount credited against the specified percentages by ACH debit of the Account. The authorization shall be irrevocable without the written consent of PURCHASER.

**1.2 Term of Agreement.** This Agreement shall have an indefinite term that shall last either until all the Merchant's obligations to PURCHASER are fully satisfied. This include but not be limited to any renewals, outstanding fees or costs.

**1.3 Financial Condition.** Merchant and Guarantor(s) authorize PURCHASER to investigate their financial responsibility and history, and will provide to PURCHASER any bank or financial statements, tax returns, or any other documentation, as PURCHASER deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of any necessary information. PURCHASER is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.4 Transactional History.** Merchant authorizes their banks or financial institions to provide PURCHASER with Merchant's banking and/or processing history to determine qualification or continuation in this program.

**1.5 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless PURCHASER, its officers, directors, shareholders, members, managers, employees, affiliates, agents and representatives against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred as a result of claims asserted against PURCHASER by Merchant to the fullest extent permitted by law.

**1.6 No Liability.** In no event will PURCHASER its officers, directors, shareholders, members, managers, employees, affiliates, agents or representatives be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

**1.7 Sale of Receipts.** Merchant and PURCHASER agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from PURCHASER to Merchant. Merchant agrees that the Purchase Price is in exchange for the sale of future Receipts pursuant to this Agreement equals the fair market value of such Receipts. PURCHASER has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to PURCHASER in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that PURCHASER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and PURCHASER shall promptly refund to Merchant any interest received by PURCHASER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that PURCHASER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

**1.8 Power of Attorney** Merchant irrevocably appoints PURCHASER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to PURCHASER from Processor/Bank, or in the case of the occurrence of any of (a) - (d) in Section 1.9 or the occurrence of an Event of Default under Section 3 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to PURCHASER; and (v) to file any claims or take any action or institute any proceeding which PURCHASER may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.9 Protections Against Default.** The following Protections 1 through 6 may be invoked by PURCHASER, immediately and without notice to Merchant in the event (a) Merchant changes its deposit relationships with any financial institution in any way that interferes with PURCHASER's collection of the Receipts due; (b) Merchant closes or changes the bank account(s) through which the Receipts are settled, or permits any event to occur that could cause diversion of any of Merchant's transactions to another bank account; (c) Merchant interrupts the operation of its business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of PURCHASER, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to PURCHASER; or (d) any debit of the Specified Amount is rejected or returned due to insufficient funds and Merchant fails to contact PURCHASER within three (3) business days. These protections are in addition to any other remedies available to PURCHASER at law, in equity or otherwise pursuant to this Agreement.

Protection 1. The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately

Protection 2. PURCHASER may enforce the provisions of the Personal Guaranty of Performance against the Guarantor.

Protection 3. PURCHASER may enforce its security interest in the Collateral identified in Article III hereof.

Protection 4. The entire Purchase Amount shall become immediately refundable to PURCHASER from Merchant.

Protection 5. PURCHASER may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which PURCHASER shall recover judgment against Merchant, Merchant shall be liable for all of PURCHASER's costs of lawsuit, including but not limited to attorneys' fees of twenty-five percent (25%) of any balance due, court costs and expenses.

Protection 6. PURCHASER may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise.

**1.10 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes PURCHASER to disclose information concerning Merchant's and each Owner's credit standing (including credit bureau reports that PURCHASER obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner hereby waives to the maximum extent permitted by law any claim for damages against PURCHASER or any of its affiliates and the PURCHASER relating to any (i) investigation undertaken by or on behalf of PURCHASER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.11 Publicity.** Merchant and each Owner only authorizes PURCHASER to use its, his or her name in a listing of clients and in advertising and marketing materials with their express written consent.

**1.12 UCC Agent & D/B/A's.** Merchant hereby acknowledges and agrees that PURCHASER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between PURCHASER and Merchant, any may file UCC-1 financing statements and other notices or filings using such names on its own behalf or though PURCHASER's UCC agent. PURCHASER shall have no obligation to terminate any UCC financing statement filed in connection with this Agreement absent a written request by PURCHASER and after delivery of the Receipts Purchased Amount.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS
Merchant represents, warrants and covenants that as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Merchant is solvent, and no transfer of property is

being made by Merchant and no obligation is being incurred by Merchant in connection with this Agreement with the intent to hinder, delay, or defraud either present or future creditors of Merchant. Merchant's bank statements and financial information, provided to PURCHASER fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant is current on any and all lease, rent or mortgage payments due. No material changes, financial or otherwise, in the condition, operation or ownership of Merchant are in any way expected or anticipated. Merchant has a continuing, affirmative obligation to advise PURCHASER of any material change in its financial condition, operation or ownership. PURCHASER may request statements at any time during the performance of this Agreement and the Merchant shall provide them to PURCHASER within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming PURCHASER as loss payee and additional insured in amounts and against risks as are satisfactory to PURCHASER and shall provide PURCHASER proof of such insurance upon request.

**2.5 Tax Obligations.** Merchant is currently in compliance with all federal state and local tax laws, has filed all returns, and has paid all taxes due, except as disclosed to PURCHASER.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the PURCHASER or change any of its places of business without ten (10) days prior written notice to PURCHASER.

**2.7 Daily Batch Out.** Merchant will batch out receipts with all payment processors on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from PURCHASER to Merchant, execute, acknowledge and deliver to PURCHASER and/or to any other person, person firm or corporation specified by PURCHASER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy or Insolvency**. As of the date of this Agreement, Merchant represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue, and there has been no involuntary petition under such laws brought or pending against Merchant. Merchant

further warrants that it does not anticipate filing any such voluntary bankruptcy petition and does not anticipate that an involuntary petition will be filed against it.

**2.10 Additional Financing. Merchant shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase of receivables or a loan to the business with any party other than PURCHASER without PURCHASER's written permission.**

**2.11 Unencumbered Receipts.** Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of PURCHASER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Default Under Other Contracts.** Merchant's execution of and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

### III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing within 120 days of funding its inability to pay its debts, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (h) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (i) Merchant shall use multiple depository accounts without the prior written consent of PURCHASER; (j) Merchant shall change its bank account without the prior written consent of PURCHASER; (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; or (l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with PURCHASER.

**3.2 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4 hereof, PURCHASER on its own and on behalf of the PURCHASER may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or

remedy. All rights, powers and remedies of PURCHASER in connection with this Agreement may be exercised at any time by PURCHASER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3 Costs.** Merchant shall pay to PURCHASER all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of PURCHASER's remedies set forth herein, including but not limited to expenses, court costs and attorneys' fees of twenty-five percent (25%) of any balance due.

**3.4 Required Notifications. Merchant is required to give PURCHASER written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give PURCHASER seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or equity interests.**

### IV. MISCELLANEOUS

**4.1 Modifications: Amendment.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by PURCHASER.

**4.2 Assignment.** PURCHASER and any Principal may assign, transfer or sell its right to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part. Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of PURCHASER which consent may be withheld in PURCHASER's sole discretion. PURCHASER reserves the rights to sell or assign this Agreement with or without prior written notice to Merchant.

**4.3 Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to PURCHASER the address set forth in this Agreement and shall become effective only upon receipt.

**4.4 Waiver.** No failure on the part of PURCHASER to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** Merchant and Guarantor agree that any suit, action or proceeding to enforce or arising out of this Agreement shall be brought in any court in the Commonwealth of Virginia or in the United States District Court for the Eastern District of Virginia (the "Acceptable Forums"), and Merchant and Guarantor waive personal service of process. Merchant and Guarantor agree that the Acceptable Forums are convenient to them, submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. In the event a legal proceeding concerning this Agreement is initiated in any other forum, Merchant and Guarantor waive any right to oppose any motion or application made by PURCHASER to transfer such proceeding to an Acceptable Forum, or to dismiss the action on the grounds of *forum non conveniens*.

DocuSign Envelope ID: 8C2601D2-2145-4726-B3CE-E7D1F4540436

Case 3:20-cv-01022-X Document 46 Filed 12/29/20 Entered 12/29/20 13:56:39 Desc Exhibit B - Factoring Agreement Page 32 of 46

This Agreement and any Claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with Virginia law (to the extent not preempted by federal law) without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for under this Agreement will be governed by the laws of the Commonwealth of Virginia. Merchant and Guarantor understand and agree that (i) PURCHASER and/or Kapitus Servicing are located in Virginia, (ii) all final credit decisions are made from Virginia, (iii) the Agreement is made in Virginia (that is, no binding contract will be formed until Merchant's signed Agreement is received and accepted in Virginia) and (iv) Merchant's payments are not accepted until received in Virginia.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.8 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and Security Agreement and Guaranty hereto embody the entire agreement between Merchant and PURCHASER and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.9 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**4.10 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION. TO THE EXTENT ANY PARTY IS PERMITTED TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION, THE PARTIES HERETO AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY**

SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION. THIS PROVISION IS A MATERIAL INDUCEMENT FOR PURCHASER TO ENTER INTO THIS AGREEMENT.

**4.11 ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* **THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.**

Covered claims

a. *Merchant and/or Performance Guarantors, (collectively hereinafter referred to as "Merchant") or PURCHASER may arbitrate* any claim, dispute or controversy between Merchant and PURCHASER arising out of or related to this Agreement, any other agreement, or the Merchant/PURCHASER relationship ("Claims").
b. **If arbitration is chosen by any party in accordance with paragraph 4.11(h) neither Merchant nor PURCHASER will have the right to litigate that Claim in court or have a jury trial on that Claim.**
c. Except as stated below, the Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, Merchant or PURCHASER's negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with PURCHASER or Merchant or claiming through PURCHASER or Merchant, or by someone making a claim through PURCHASER or Merchant, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

Arbitration limits

d. Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.
e. PURCHASER will not initiate arbitration to enforce its rights under this Agreement. If Merchant asserts a Claim against PURCHASER, PURCHASER may elect to arbitrate any Claims against PURCHASER.
f. Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any party, neither Merchant nor PURCHASER may pursue a Claim as part of a class action or other representative action. Claims of 2 or more persons may not be combined in the

same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

How arbitration works

g. Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA Commercial Arbitration Rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. Merchant can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879. Merchant or PURCHASER may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel. Notwithstanding any terms to the contrary, any in-person hearing will be held in Arlington, Virginia

h. Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered. Neither Merchant nor PURCHASER waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, or motion in a lawsuit. To choose arbitration, a party must file a motion to compel arbitration in a pending matter or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

i. The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which may limit discovery. The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested to do so. The arbitrator shall apply the substantive laws of the Commonwealth of Virginia without regard to any applicable principals of conflicts of law.

j. The arbitrator shall make any award in writing and, if requested by Merchant or PURCHASER, shall include a reasoned opinion for the award. An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

k. The arbitrator shall have no authority to award punitive damages, consequential damages, or other damages not measured by the prevailing party's actual damages, except as required by statute.

Paying for arbitration fees

l. Arbitration fees will be allocated according to the applicable AAA Rules. All parties are responsible for their own attorney's fees, expert fees and any other expenses unless the arbitrator awards such fees or expenses to PURCHASER based on applicable law.

m. The parties agree that failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witnesses. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such

waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

n. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties.

**The final award**

o. Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award pursuant to the AAA's Optional Appellate Arbitration Rules. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**

p. This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between Merchant and PURCHASER, including the bankruptcy of any party and any sale of Merchant account, or amounts owed on Merchant account, to another person or entity. If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim. This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between Merchant and PURCHASERs.

**RIGHT TO OPT OUT OF ARBITRATION.**

q. MERCHANT AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, MERCHANT AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE MERCHANT AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, MERCHANT AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: Kapitus Servicing, Inc. – ARBITRATION OPT OUT, 2500 Wilson Boulevard, Suite 350, Arlington, VA 22201 ATTENTION: General Counsel.

**4.12 PURCHASER acting as Agent.**

PURCHASER has entered into this Agreement, the Merchant Security Agreement and the Guaranty (collectively, the Transaction Documents") as agent (in such capacity, "Agent") for itself and one or more third parties as "co-investors" or "co-PURCHASERs" (each a "Principal"). Agent and each Principal have elected to treat the transaction consummated under the Transaction Documents (the "Transaction") as a single transaction on behalf of separate Principals, and Agent hereby certifies that the portion of the Transaction allocable to the account of each of the Principals (the "Portion") for which it is acting (to the extent that any such Transaction is allocable to the account of more than one Principal) as set forth in one or more addenda to

All references to "PURCHASER" or "Merchant" or "Performance Guarantors," as the case may be, in the Transaction Documents shall be subject to the provisions of this Section 4.12 and shall be construed to reflect that (i) each Principal shall have, in connection with the Transaction entered into by the Agent on its behalf, all of the rights, responsibilities, privileges and obligations of a "PURCHASER" directly entering into such Transaction with the other parties under each of the Transaction Agreements and (ii) Agent's Principals have designated Agent (acting directly or through the Authorized Subservicing Agent) as their sole agents for performance of PURCHASER's obligations to Merchant and for receipt of performance by Merchant of its obligations to PURCHASER in connection with the Transaction (including, among other things, as Agent for each Principal in connection with transfers of cash or other property and as agent for giving and receiving all notices under the Transaction Documents), either directly. Both Agent and its Principals shall be deemed "parties" to the Transaction Documents and all references to a "party" or "either party" in any Transaction Document shall be deemed revised accordingly.

The parties hereto acknowledge and agree that any assignment, pledge and/or grant to PURCHASER by the Merchant or a Performance Guarantor of a security interest in and to any property and assets (including the Collateral and the Additional Collateral) pursuant to any of the applicable Transaction Agreements to secure the payment and/or performance of any of their respective and/or joint obligations, shall be deemed to have been made to the PURCHASER for and on behalf of itself and any other Principal. PURCHASER hereby agrees to hold all Collateral and Additional Collateral hereafter delivered to it pursuant to the Transaction Documents, for itself and for the benefit of the Principals, on and subject to the terms and conditions set forth in the Transaction Documents. In its capacity, the Agent and Sub-Servicing Agent are each a "representative" of each of the Principals within the meaning of the term "secured party" as defined in the UCC. In addition to the representations and warranties set forth in the Transaction Documents, Agent hereby makes the following representations and warranties, which shall continue during the term of any Transaction: Principal has duly authorized Agent to execute and deliver the Transaction Documents on its behalf, has the power to so authorize Agent and to enter into the Transaction contemplated by the Transaction Documents and to perform the obligations of Fumder, and has taken all necessary action to authorize such execution and delivery by Agent and such performance by it.

**4.13 Counterparts; Facsimile and PDF Acceptance.** This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: [signature]

DocuSign Envelope ID: 3B72A761-BF24-4F2E-A822-25E7D4FE43C0

SECURITY AGREEMENT AND GUARANTY
Document Page 3 of 6

Merchant's Legal Name: <u>LYNDON D. TAYLOR, M.D. LLC</u>

D/B/A: <u>Healthcare for Women: The Office Of Lyndon Taylor, MD</u>

Physical Address: <u>1100 Lake St Ste 260</u>   City: <u>Oak Park</u>   State: <u>IL</u>   Zip: <u>60301-1095</u>

Federal ID# <u>72-1588775</u>

## SECURITY AGREEMENT

**Security Interest.** To secure Merchant's payment and performance obligations to PURCHASER under the Future Receivable Factoring Agreement between Merchant and PURCHASER (the "Merchant Agreement"), Merchant hereby grants to PURCHASER a security interest in all accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to the Merchant arising out of goods sold or leased or for services rendered by Merchant, the proceeds thereof and all of Merchant's rights with respect to any goods represented thereby, whether or not delivered, goods returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation, together with all customer lists, books and records, ledger and account cards, computer tapes, software, disks, printouts and records, whether now in existence or hereafter created, relating thereto (collectively referred to hereinafter as "Receivables"); (ii) all inventory, including without limitation, all goods manufactured or acquired for sale or lease, and any piece goods, raw materials, work in process and finished merchandise, findings or component materials, and all supplies, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of Merchant or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which Merchant now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Merchant or is held by Merchant or by others for Merchant's account (collectively referred to hereinafter as "Inventory"); (iii) goods, including without limitation, all machinery, equipment, parts, supplies, apparatus, appliances, tools, fittings, furniture, furnishings, fixtures and articles of tangible personal property of every description now or hereafter owned by the Grantor or in which Grantor may have or may hereafter acquire any interest, at any location (collectively referred to hereinafter as "Equipment"); (iv) general intangibles in which the Merchant now has or hereafter acquires any rights, including but not limited to, causes of action, corporate or business records, inventions, designs, patents, patent applications, trademarks, trademark registrations and applications therefor, goodwill, trade names, trade secrets, trade processes, copyrights, copyright registrations and applications therefor, licenses, permits, franchises, customer lists, computer programs, all claims under guaranties, tax refund claims, rights and claims against carriers and shippers, leases, claims under insurance policies, all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "Intangibles"); (v) All the capital stock, bonds, notes, partnership interests, member interests in limited liability companies, and other securities, if any, held of record or beneficially by the Merchant, including without limitation the capital stock of all subsidiaries of the Merchant, and the Merchant's interests in all securities brokerage accounts (collectively referred to hereinafter as "Investments"); (vi) all cash on hand and on deposit in banks, trust companies and similar institutions, and all property accounted for in the Merchant's financial statements as "cash equivalents" (collectively referred to hereinafter as "Cash"); (vii) all other assets, proceeds and items not directly referred to herein as those terms are defined in Article 9 of the Uniform Commercial Code under applicable federal and state law (collectively referred to hereinafter as "UCC Article 9 Items"); (viii) all accessions to, substitutions for, and all replacements, products and proceeds of the Receivables, Inventory, Equipment, Intangibles, Investments, Cash and UCC Article 9 Items (collectively referred to as "Collateral"), including without limitation proceeds of insurance policies insuring the Collateral; and (ix) Books and records relating to any of the Collateral (including without limitation, customer data, credit files, computer programs, printouts, and other computer materials and records of the Merchant pertaining to any of the Collateral), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of the foregoing. If the Merchant identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to PURCHASER under any other agreement between Merchant and PURCHASER will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with PURCHASER, any security interest granted to PURCHASER under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interest in the Collateral.

**Cross-Collateral.** To secure the payment and performance obligations to PURCHASER (and the PURCHASERs) under this Merchant Security Agreement and Guaranty (this "<u>Agreement</u>"), Merchant and each Guarantor hereby grants PURCHASER, for itself and its participants, a security interest in the collateral set forth in the Addendum to the Security Agreement and Guarantee  (the "<u>Additional Collateral</u>"). Each Guarantor agrees and acknowledges that PURCHASER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to PURCHASER under any other agreement between Guarantor and PURCHASER will secure the obligations hereunder, and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interest in the Additional Collateral.

Guarantor further acknowledges and agrees that, if Guarantor enters into future Agreements with PURCHASER, any security interest granted to PURCHASER under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as PURCHASER deems necessary to perfect or maintain PURCHASER's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements.  Each of Merchant and each Guarantor hereby authorizes PURCHASER to file any financing statements deemed necessary by PURCHASER to perfect or maintain PURCHASER's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to PURCHASER with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with PURCHASER's rights.  Merchant and each Guarantor shall be jointly and severally liable for and shall pay to PURCHASER upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by PURCHASER in protecting, preserving and enforcing PURCHASER's security interest and rights.

**Negative Pledge.** Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional financings, loans, lien or other encumbrance of any kind on or with respect to any of these Collateral without obtaining the prior written permission of PURCHASER.

**Consent to Enter Premises and Assign Lease.** PURCHASER shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, PURCHASER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that PURCHASER may enter into an agreement with Merchant's landlord giving PURCHASER the right: (a) to enter the Premises and to take possession of the fixtures, equipment and other Collateral therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

**Remedies.** Upon any Event of Default, PURCHASER may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to PURCHASER, whether by acceleration or otherwise.

## GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to PURCHASER Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) if within 120 days Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts. (It is understood by all parties that Guarantors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

**Guarantor Waivers.** In the event that Merchant fails to make a payment or perform any obligation due to Guarantor's actions or malfeasance under the Merchant Agreement, PURCHASER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross-Collateral PURCHASER may hold pursuant to this Agreement or any other guaranty.

PURCHASER does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) PURCHASER's acceptance of this Agreement ; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to PURCHASER. In addition, PURCHASER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to PURCHASER; (ii) release Merchant from its obligations to PURCHASER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount plus any accrued but unpaid interest and Merchant's other obligations to PURCHASER under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement including without limitation under the following rights and remedies: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that PURCHASER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

## Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

INITIALS:

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**Consent to Receive Autodialed and Prerecorded Calls and Messages.** PURCHASER, Kapitus Servicing, Inc., as servicer, and their subsidiaries and affiliates (collectively, Kapitus) may from time to time notify Merchant(s), and Owner(s) of various promotional offers and other marketing information, or contact Merchant(s) and Owners(s) in connection with the servicing of this Agreement, or in connection with any default under this Agreement. By signing this Agreement, Merchant(s), and Owner(s) expressly consent and authorize Kapitus to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Merchant(s) and Owner(s) in this Agreement or corresponding administrative form or any other applications for funding, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list for purposes of servicing, collections, marketing, or promoting any product offered by Kapitus.

Please note that Merchant(s) and Owner(s) are not required to consent to this section of this Agreement in order to qualify or obtain any products or services from Kapitus. If you do not agree to be called for marketing or promotional purposes please call (844) 547-9396 or email DNC@kapitus.com

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", ARE HEREBY INCORPORATED IN FULL AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT AGREEMENT.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO. IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID. ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

**MERCHANT**

By    __Lyndon Taylor_____
          **(Print Name and Title)**

**OWNER/GUARANTOR #1**

By    __Lyndon Taylor_____
          **(Print Name)**

**OWNER/GUARANTOR #2**

By    __N/A_____
          **(Print Name)**

DocuSigned by:

_Lyndon Taylor_
E0B5D61A16FF412...     **(Signature)**

DocuSigned by:

_Lyndon Taylor_
E0B5D61A16FF412...     **(Signature)**

_____
       **(Signature)**

DocuSign Envelope ID: 3B720761D7D2-14E5-A822-26E7D41E4368

Case 20-01221 Doc 24 Filed 02/39/20 Entered 02/39/20 13:56:39 Desc Exhibit
B - Factoring Agreement Page 37 of 46 Page 1 of 12



## APPENDIX A: SCHEDULE OF FEES

**A. Origination Fee**                                           **To cover underwriting and related expenses**

| Amount Funded | Origination Fee |
|---|---|
| Up to $15,000.00 | $395.00 |
| Over $15,000.00 | 2.5% of Amount Funded |
| Due diligence Fee | $0.00 |

**B. Rejected ACH or NSF Fee**
**If Daily ACH Payments**

| Amount Funded | Reject Fee |
|---|---|
| Up to $7,500.00 | $25.00 |
| $7,501.00-$50,000.00 | $35.00 |
| $50,001.00-$100,000.00 | $50.00 |
| $100,001.00-$250,000.00 | $75.00 |
| Over $250,000.00 | $100.00 |

**If Weekly ACH Payments**

| Amount Funded | Reject Fee |
|---|---|
| Up to $7,500.00 | $75.00 |
| $7,501.00-$50,000.00 | $99.00 |
| $50,001.00-$100,000.00 | $175.00 |
| $100,001.00-$250,000.00 | $275.00 |
| Over $250,000.00 | $395.00 |

**C. Bank Change Fee**        $75.00        **When Merchant requires a change of account to be Debited requiring us to adjust our system**

**D. Default Fee**        $2,500.00        **When Merchant defaults under the terms of this Agreement**

**E. UCC Termination Fee**        $250.00        **When Merchant requests a UCC termination**

**F. Administrative Fee**        $0.00

**Miscellaneous Service Fees.** If Merchant elects to have the funding electronically deposited to their designated bank account by Fed Wire, Merchant shall pay a $50 wire fee. If Merchant elects to have the funding electronically deposited to their designated bank account by ACH transfer, Merchant shall pay a $20.00 fee.

Other than the Origination Fee, if any, set forth above, PURCHASER is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Merchant. If Merchant is charged another such fee, IT IS NOT BEING CHARGED BY KAPITUS SERVICING OR PURCHASER NOR DOES KAPITUS SERVICING OR PURCHASER RECEIVE ANY PORTION OF SUCH FEES.

MERCHANT INITIALS: _____

ADDENDUM TO COMMERCIAL SECURITY AGREEMENT AND GUARANTY

**MERCHANT INFORMATION**

Merchant's Legal Name: <u>LYNDON D. TAYLOR, M.D. LLC</u>
D/B/A: <u>Healthcare for Women: The Office Of Lyndon Taylor, MD</u>          State of Incorporation / Organization: <u>IL</u>
Type of entity: <u>Limited Liability Corporation</u>
Physical Address: <u>1100 Lake St Ste 260</u>          City: <u>Oak Park</u>          State: <u>IL</u>          Zip: <u>60301-1095</u>
Mailing Address:          City:          State:          Zip:
Date business started (mm/yyyy): <u>06/2004</u>          Federal ID# <u>72-1588775</u>

**Additional Collateral: N/A**

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT" AND THE "SECURITY AGREEMENT AND GUARANTY" ARE HEREBY INCORPORATED IN FULL.**

<u>Joint and Several Liability.</u>  The obligations hereunder of the persons or entities constituting each Merchant and each Guarantor under this Agreement are joint and several.

**OWNER/GUARANTOR #3**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

**OWNER/GUARANTOR #4**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

**OWNER/GUARANTOR #5**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

**OWNER/GUARANTOR #6**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

**OWNER/GUARANTOR #7**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

**OWNER/GUARANTOR #8**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

**OWNER/GUARANTOR #9**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

**OWNER/GUARANTOR #10**

By    <u>  N/A                          </u>          <u>                                          </u>
                (Print Name)                                        (Signature)

# EXHIBIT C

**Fill in this information to identify the case:**

Debtor 1  Pipeline – Westlake Hospital, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern District of Illinois

Case number  19–22881

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---------|---------------------|

**1. Who is the current creditor?**

LYNDON D. TAYLOR, M.D. LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  LYNDON D. TAYLOR, M.D.

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

David E. Cohen/Fisher Cohen et al.
Name

1247 Waukegan Road, Suite 100
Number    Street

Glenview          IL          60025
City              State       ZIP Code

Contact phone  312/606-3451

Contact email  dcohen@fishercohen.com

Where should payments to the creditor be sent? (if different)

Lyndon D. Taylor
Name

479 North Harlem Ave., Apt 1328, Box 112
Number    Street

Oak Park          IL          60301
City              State       ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
         MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Case 20-00221   Doc 26   Filed 12/29/20   Entered 12/29/20 13:56:39   Desc Exhibit
C - Claim Document Case Page 2481 of 46 Page 3 of 6

Case 19-22881   Claim 94-1   Filed 12/30/19   Desc Main Document   Page 2 of 5

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $_____77,280.00    **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Physician services provided

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**  $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410   Proof of Claim   page 2

| | | Amount entitled to priority |
|---|---|---|
| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No ☑ Yes. *Check one:* | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ 0.00 |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ 0.00 |
| | ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ 13,650.00 |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ 0.00 |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ 0.00 |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12 / 24 / 2019
                  MM / DD / YYYY

*Signature*

Print the name of the person who is completing and signing this claim:

| Name | Lyndon D. Taylor | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Manager | | |
| Company | Lyndon D. Taylor, M.D. LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 479 North Harlem Ave., Apt 1328, Box 112 | | |
| | Number    Street | | |
| | Oak Park | IL | 60301 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Case 20-00221 Doc 246 Filed 02/29/20 Entered 02/29/20 13:56:39 Desc Exhibit
C - Claim Document Case Page 43 of 46 Page 5 of 6

Case 19-22881 Claim 94-1 Filed 12/30/19 Desc Main Document Page 4 of 5

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____0.00 |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____0.00 |
| ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____13,650.00 |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____0.00 |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____0.00 |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____
MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Lyndon D. Taylor |
|---|---|
| | First name          Middle name          Last name |
| Title | Manager |
| Company | Lyndon D. Taylor, M.D. LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 479 North Harlem Ave., Apt 1328, Box 112 |
| | Number          Street |
| | Oak Park                                IL          60301 |
| | City                                State          ZIP Code |
| Contact phone | _____     Email _____ |

Case 19-22881    Claim 94-1    Filed 12/30/19    Desc Main Document      Page 5 of 5

Proof of Claim – Lyndon D. Taylor. M.D. LLC

1. $13,650 for wages earned within 180 days petition date per 11 U.S.C. §507(a)(4). (195 hours @ $70 per hour).

2. $23,310 nonpriority unsecured claim for hours worked (330 hours @ $70 per hour)

3. $30,240 for contract rejection claims (30 days)

4. Total claims: $67,200

# EXHIBIT D

FILED DATE: 8/8/2019 9:20 AM 2019CH05553



Date: August 6, 2019

To: Westlake Employees and Physicians

Since this spring, Westlake has lost nearly $3 million per month and remained over 80 percent empty. As of this month, Westlake Hospital has run out of money. Despite a months-long effort by Westlake Hospital to find a buyer, none of the entities it spoke with believed that it was financially feasible to keep the Hospital open.

We now have but one choice, and that is to declare bankruptcy. Shortly after filing the bankruptcy petitions today, the Debtors filed a motion for authority to permit the Chapter 7 Trustee to operate the hospital for a seven-day period, subject to further extension. Additionally, SRC Hospital Investments II LLC, Westlake's owner, has offered to provide sufficient funds for the Trustee to pay certain of the prepetition claims of the Hospital's employees, rather than requiring them to wait until the end of the case to receive payment. A hearing for the Bankruptcy Court to consider the motion is scheduled for this afternoon.

Further, SRC Hospital Investments II LLC provided funds for the Trustee to pay the salaries of the hospital employees during the seven-day period to secure and transport or dispose patients' confidential medical records. Ultimately, however, it is up to the Chapter 7 Trustee to decide what is next for the hospital. We anticipate the Chapter 7 Trustee will be in communication with you concerning your employment.

From the outset, SRC Hospital Investments II LLC intended to invest in outpatient services in the hospital's service area while discontinuing outmoded inpatient care, but we have been thwarted at every turn by lack of support from local and state officials. Last year, for example, the state legislature voted to deprive Westlake $4 million in annual funding. Making already challenging matters worse, the Village of Melrose Park voted unanimously in December 2018 to withdraw $500,000 of public support for Westlake's redevelopment.

In spite of the insurmountable challenges we've confronted at Westlake, we remain committed to providing high-quality, cost-effective care in the Chicago region, and this bankruptcy filing will not affect West Suburban Medical Center or Weiss Memorial Hospital.

We regret the impact this will have on Westlake employees. We know many of you have worked tirelessly for years here to deliver care to patients. Your dedication to serving patients is to be commended, especially during these last several months.

Sincerely,

Joseph Ottolino
CEO

1225 West Lake Street, Melrose Park, IL 60160          www.westlakehosp.com